19064

STATE of South Carolina, Appellant, v. LIFE INSURANCE
COMPANY OF GEORGIA, Respondent

(175 S. E. (2d) 203)

*Messrs. Daniel R. McLeod, Attorney General,* and *Glen E. Craig,* of Columbia, *for Appellant,*

*Messrs. Turner, Padget, Graham & Laney,* of Columbia, *for Respondent,*

*Messrs. Daniel R. McLeod, Attorney General,* and *Glen E. Craig,* of Columbia, *for Appellant, in Reply.*

June 11, 1970.

BUSSEY, Justice.

The respondent, Life Insurance Company of Georgia, is a foreign insurance company licensed to write both life and accident and health insurance in South Carolina. This action was instituted by the State on May 27, 1968, pursuant to Sec. 37-127 of the Code, to recover certain additional license fees alleged to be due by the respondent under Sections 37-122 and 37-124 of the Code, as well as interest and penalties.

The complaint contained five causes of action based on alleged deficiencies for five different years as follows: first, 1958; second, 1960; third, 1961; fourth, 1964; and fifth, 1965. The respondent by answer denied it owed the amounts alleged to be due but admitted that certain license fees were due with respect to its premium income during 1958 and 1961. Additionally, respondent alleged the overpayment of license fees with respect to its premium income during 1959 and 1960, as to which the respondent counterclaimed. Respondent also pled the statute of limitations, Code Sec. 10-143(2), with respect to the second and third causes of action based on the years 1960, 1961. The respondent also specifically denied that it was liable for any interest or penalties.

The appellant filed two demurrers, one relating to respondent's defense to interest and penalties, and the other to respondent's plea of the statute of limitations.

The parties stipulated that the pleadings raised two questions for decision by the lower court, as to the proper construction of Code Sec. 37-123. The lower court decided both of these questions, which will be hereinafter dealt with in detail, adversely to the appellant, and also overruled both of appellant's demurrers.

Sec. 37-122 of the Code imposes an additional and graded license fee in an amount equal to two per cent of life insurance premiums collected by the respondent, and Code Sec. 37-124 imposes a like additional license fee on accident and health insurance premiums. Sections 37-123 and 37-125 of the Code provide for certain reductions in the amount of the additional license fees imposed upon an insurer complying with the provisions thereof. Section 37-123 reads as follows:

*"Reduction of such fee on account of local investments.*—If the executive officer making a return for a company required to pay the additional fee provided by § 37-122 shall file with the Commissioner a sworn statement showing that at least one fourth of the reserve on all policies issued in this State is invested in any or all of the following securities or property, to wit, (a) notes or bonds of this State or of counties or municipalities of this State or subdivisions thereof, (b) first mortgage bonds of real estate in this State or first mortgage bonds of solvent domestic or domesticated corporations whose improved property is situate entirely within this State and which are owned and controlled independently of foreign corporations and operated entirely within the State, (c) average daily balance on deposits in banks of this State maintained continuously for twelve months next preceding the date of the return or (d) any property situate within the State and returned for taxes therein, at the value at which it is returned, then the additional license fee on

premiums collected during the time such investments have been actually made and maintained shall be one and three fourths per cent. Under like conditions if such investment be one half of such reserve, the additional license fee shall be one and one half per cent. Under like conditions if such investment be three fourths of such reserve, the additional license fee shall be one and one fourth per cent. And if the entire reserve be so invested, under like conditions, the additional license fee on such premium receipts shall be one per cent."

Section 37-125, in brief, provides for a like reduction with respect to the additional license fee on accident and health insurance premiums but conditioned upon investment of premiums collected rather than "the reserve on all policies."

The respondent admittedly has substantial investments in the State of South Carolina and for the years in question was entitled to some reduction in its additional license fees by virtue of the provisions of Sections 37-123 and 37-125, but just how great a reduction is dependent upon the construction of the provisions of Code Sec. 37-123. Before proceeding to the contention of the parties as to the proper construction of Code Sec. 37-123, it is appropriate to consider the nature of that section, as well as the nature of Sections 37-122 and 37-124.

We first consider the nature of Code Sections 37-122 and 37-124. Each of these sections imposes an "additional license fee." The term "license fee" has a distinct meaning, although the distinction between that term and ordinary taxes is frequently disregarded both in statutes and judicial decisions. It is sometimes difficult to determine whether a sum imposed is a license fee proper or simply a tax, but in this case we are of the view that, although denominated a "license fee", the sum imposed is actually a tax.

"Whether a fee exacted is a license fee proper or a tax for revenue depends on the purpose of the exaction and the power, whether police or taxing power, by which it is ex-

acted, and the denomination given to the fee or tax by the legislature is not controlling." 53 C. J. S. Licenses § 3, p. 452.

"Where, however, it appears that revenue is the main objective of the tax, and the amount exacted is greatly in excess of the probable amount necessary to issue licenses and inspect and regulate the business, it is generally regarded as a tax for revenue and not a license tax. In determining the nature of the tax or fee, the distribution of the fund obtained as a result of the statute is one element which may be considered along with others, but it is not the determinative factor." 53 C. J. S. Licenses § 3, p. 454.

It is, we think, a matter of common knowledge that the policy traditionally pursued in this State has been to exact from insurance companies doing business in in this State, both foreign and domestic, license fees greatly in excess of any amount probably necessary, or actually expended, to issue licenses and inspect and regulate the insurance business. The license fees involved in this action are collected by the Commissioner and deposited with the State Treasurer and one half thereof is disbursed proportionately to the counties of the State, in which the premiums were collected, and appropriated to ordinary county purposes. See Code Sec. 37-126. Under these circumstances we have no hesitancy in concluding that the additional license fees here involved are primarily taxes for revenue, although denominated "license fees" in the statutes by which they are imposed.

The obvious purpose of Code Sections 37-123 and 37-125 is to encourage foreign insurers to invest their reserves and premiums in South Carolina securities or property, but, as we view it, these statutes are clearly exemption, or partial exemption, provisions which bring into play the well settled rule that "Constitutional and statutory language creating exemptions from taxation will not be strained or liberally construed in favor of the

taxpayer claiming the exemption, he must clearly bring himself within the constitutional or statutory language upon which he relies." *York County Fair Assoc. v. South Carolina Tax Commission,* 249 S. C. 337, 154 S. E. (2d) 361, 363 (1967). See also, *Chronicle Publishers, Inc. v. South Carolina Tax Commission,* 244 S. C. 192, 136 S. E. (2d) 261 (1964) ; *Colonial Life and Accident Ins. Co. v. South Carolina Tax Commission,* 248 S. C. 334, 149 S. E. (2d) 777 (1966), and *Southern Soya Corp. of Cameron v. Wasson, et al.,* 252 S. C. 484, 167 S. E. (2d) 311 (1969).

We have not previously been called upon to consider the nature of Code Sec. 37-123 and know of only one case squarely in point from any other jurisdiction. In the Texas case of *State Board of Insurance v. Southwest General Ins. Co.,* Tex. Civ. App., 401 S. W. (2d) 369 (1966), the Court was called upon to decide whether, under statutory language quite similar to ours, certain investments qualified as Texas securities for the purpose of obtaining a reduction in the taxes due. The court held that the particular investment was not a Texas security and stated, *inter alia,*

"The facts here also bring into application the rule that inasmuch as Article 7046 is a tax statute, any exemptions must be clearly stated and are not to be extended by implication."

In the North Carolina case of *Hatteras Yacht Co. v. High,* 265 N. C. 653, 144 S. E. (2d) 821 (1965), the court held that a statute which taxed certain transactions at a lower rate than made applicable in general was a partial exemption and therefore subject to the rule of strict construction against the taxpayer. Although the respondent argues otherwise, no authority in point is cited in support of the contention that it is entitled to a liberal as opposed to a strict construction of the particular Code section. We conclude that Sec. 37-123 is a partial exemption statute which, according to the settled rule, has to be strictly construed against the taxpayer. As was said in *Southern*

*Soya Corp. of Cameron v. Wasson, supra,* "the deduction and benefit is allowed as a matter of legislative grace. In order to take advantage of this statute the respondent was required to meet the conditions of the statute which granted the benefit."

We come now to the first question presented. In calculating the amount of reduction to which the respondent was entitled by virtue of the provisions of Code Sec. 37-123, the Commissioner calculated such upon the basis of the amounts of the life insurance reserves as of December 31st of each of the years involved. The respondent contends, and the lower court held, that the Commissioner should have, instead, calculated an average reserve for each of the particular years by adding the total reserve at the beginning of the year to the total reserve at the end of the year and dividing by two.

Admittedly, Sec. 37-123 does not specifically authorize the averaging of reserves for the year, nor does it specifically refer to the total reserve as of December 31st. It seems to be agreed that there is a day to day variation in the amount of reserve actually existing and that normally a company accurately calculates its reserve only once a year, to wit, as of December 31st. It is argued that since the obvious purpose of the statute is to encourage foreign insurers to invest in South Carolina, and since it gets the benefit of Code Sec. 37-123, only "during the time such investments have been actually made and maintained", it is unrealistic, unfair, and inequitable to use the total reserve shown as of December 31st as a basis for calculating what reduction, if any, in the tax an insurer is entitled to. It is true that the use of December 31st as a reserve date might make it difficult for an insurer to get the full benefit of Sec. 37-123 by investing its entire reserve in South Carolina. The maximum benefit, however, can be obtained by the simple expedient of maintaining sufficient average daily balances on deposits in banks of this State in compliance with item (c) of Sec. 37-123, if an insurer deems it economically advantageous to do so.

The legislature could have, if so minded, adopted an exemption or partial exemption statute more favorable to foreign insurers. On the other hand, it could have adopted none at all. The difficulty which might or might not be experienced by insurers in sufficiently complying with the exemption statute to get the full benefit thereof is not a matter for judicial interference or relief.

While the Code section makes no mention of December 31st with respect to the reserve of an insurer, we think such date was clearly contemplated by the statute. The section commences with the following language: "If the executive officer making a return for a company * * * shall file with the Commissioner a sworn statement showing that at least one fourth of the *reserve on all policies issued in this State is invested * * *.*" (Emphasis added.) Just what premiums subject to the tax have been collected by a company within a particular year is not known until December 31st. The "reserve on all policies issued in this State" is admittedly known by the insurer only once a year, to wit, on December 31st. The amount of reserve on life insurance policies is a liability which must be included in financial statements. Sec. 37-289.1(3) (a). The amount of such reserve must be computed as of December 31st in order for the insurer to file the required annual statement. Sec. 37-293. The insurer's required annual statement must be filed with the Commissioner on or before March 1st of each year. Code Sec. 37-293. The insurer's license fee return like its annual statement showing the amount of reserve on life insurance policies must also be filed with the Commissioner on or before March first of each year. Sec. 37-127.

When Sec. 37-123 is considered in the light of the foregoing statutory requirements, we think it is clear that the reserve referred to therein is the reserve computed most recently prior to the filing of the return, to wit, the reserve as of December 31st.

The next question is what value should be placed upon property owned by respondent within this State for the pur-

pose of Sec. 37-123, in view of the following language contained in said section: "at the value at which it is returned." It is a matter of common knowledge that various counties in this State have for years applied varying assessment ratios to the true or market value of property for the purpose of arriving at the assessed value thereof for taxation. It is also, we think, a matter of common knowledge that many taxpayers return their property at its assessed value, rather than its true or market value. The propriety of these practices is not here at issue. Based on these facts, however, the respondent contends, and the lower court held, that the language "at the value at which it is returned" should be construed to mean the true or market value of the property, rather than the assessed value at which the respondent returned its property for taxation. It is obvious that the statute makes no mention of the true or market value of property as opposed to the value at which it is returned for taxation. While admittedly the property of the respondent in this case is much more valuable than the values at which it was returned for taxation, it is not even suggested, as a practical matter, just how either the respondent or the Commissioner would go about establishing the true or market value of respondent's property for the purpose of Code Sec. 37-123, if the construction of the language adopted below be approved.

Some counties in South Carolina no longer require an annual return with respect to real property, but in all instances where returns are required of property, whether real or personal, for taxation, the taxpayer is required to return such, under oath, at what the taxpayer believes to be the true value of the property. Not all of the tax returns of the respondent for the years in question are included in the record, but such as are included indicate that the property was returned at the assessed values, respondent's agents asserting that such were the true market values thereof. We know of nothing which would have prevented the respondent from returning its property for what it truly believed to be the market value thereof and leaving it to the

assessors to apply whatever assessment ratios were being used in the respective counties.

The basic provisions of what is now Sec. 37-123 first appeared in Sec. 14 of Act No. 3 of 1909. Initially that statute provided an investment credit, *inter alia,* with respect to "any property situate in this State and taxable therein." By Act No. 249 of 1914, the 1909 Act was amended to read as now "any property situate within this State and returned for taxes therein, at the value at which it is returned." Important to the construction of this language is the history thereof. We take judicial notice of the official reports of the Comptroller General between 1909 and 1914, when the Act was amended. *State v. Broad River Power Co.,* 177 S. C. 240, 181 S. E. 41 (1935). Reference to these reports shows that the Comptroller General was constantly calling to the attention of the General Assembly inequalities in the then present system of property taxation. Called to the attention of the General Assembly was the reluctance of taxpayers in general to disclose by their returns the true value of their property for fear of greatly increased taxes, and the fact that property was being assessed "at ten or fifteen per cent of its real value". Also called to the attention of the General Assembly was the fact that there were many corporations in South Carolina whose names did not anywhere appear on county auditor's books. According to the Comptroller General, in 1911 in Charleston County alone there were ten insurance companies liable for taxes, eight of which did not appear on the county auditor's books, and in Richland County there were twenty-seven different corporations whose names did not appear on the county auditor's books. In brief, these reports constantly called to the attention of the General Assembly the general reluctance of taxpayers to return their property at true value, and the reluctance of corporations, particularly insurance companies, to return their property at all. It was in the light of this history that the 1914 amendment was adopted and there can be no doubt that the legislature by such amendment intended that

foreign insurers, such as the respondent here, should not receive any investment credit for its property within this State unless returned for taxes, and then only to the extent of the value at which it was returned. As above mentioned, this particular statute is a tax exemption statute and, therefore, has to be strictly construed. The purpose and intent of the particular statutory language, we think is clear and unambiguous. The fact that the respondent here has pursued a practice, fairly common among taxpayers, of returning its property at an assessment ratio value, rather than its true value, does not and should not change the meaning and intent of the legislature.

We next consider whether the lower court was correct in overruling appellant's demurrer interposed to respondent's defense of the six year statute of limitations, Code Sec. 10-143, which provides, *inter alia,* that "an action upon a liability created by statute other than a penalty or forfeiture; * * * must be commenced within six years." With exceptions not here pertinent, Code Sec. 10-150 makes the provisions of Sec. 10-143 applicable to an action brought in the name of the State or for its benefit.

The lower court held that the instant case was an action upon a "liability created by statute, other than a penalty or forfeiture", and that, hence, the plea of the six year statute of limitations was properly interposed to the second and third causes of action, 1960, 1961.

We agree that, strictly speaking, the action here is upon a liability created by statute but it does not follow that the six year statute of limitations may be successfully interposed. In the absence of a specific applicable limitation, the general rule seems to be that the ordinary period of limitation applicable to "an action upon a liability created by statute" applies to an action for the collection of taxes and assessments, but where there is an applicable specific limitation, such ordinary limitation does not apply. 53 C. J. S. Limitations of Actions § 83b, p. 1054. In the

instant case, we have a specific limitation which is applicable. Code Sec. 65-2707 provides that:

"The State may bring suit in court for back taxes at any time within ten years from the date when they should have been paid, * * *."

This specific applicable limitation removes the instant case from the application of the ordinary period of limitation applicable to actions upon other liabilities created by statute.

Additionally, it is established in this State that where there is any doubt as to which of two statutes of limitation applies, the doubt must be resolved in favor of the longer period. We quote the following from *Scovill v. Johnson,* 190 S. C. 457, 3 S. E. (2d) 543 (1939).

"Strictly speaking, a statute of limitation when applicable is not a defense to an action, but when pleaded, which it must be in order for a defendant to benefit therefrom, is a bar to the action. A limitation statute is a statute of grace, permitting the avoidance and evasion of the liability; and while given recognition when pleaded, it has never been favored by the Courts.

"If there is any doubt as to which of two statutes applies, that doubt must be resolved in favor of the longest period, according to the great weight of authority."

For the foregoing reasons we hold that the six year statute of limitations, Code Sec. 10-143, is not here applicable and the lower court was, accordingly, in error in overruling appellant's demurrer to the plea of such statute.

Respondent, with respect to each of the causes of action, pled that it was not liable for interest or penalties since a valid dispute existed as to the amount, if any, of the fees due; that no means was provided whereby respondent could have paid disputed sums under protest and sued to recover the same; that respondent had been awaiting an administrative ruling by the Insurance Department, and because of

such delay on the part of the Department and the failure to earlier bring suit, appellant had waived its right to seek interest and penalties and was estopped from so doing. Appellant demurred to such alleged defense, and, as above noted, such demurrer was overruled. In overruling the demurrer, the court below relied on the cases of *Colonial Life and Accident Ins. Co. v. South Carolina Tax Commission,* 248 S. C. 334, 149 S. E. (2d) 777 (1966), and *Springfield v. Williams Plumbing Supply Co.,* 249 S. C. 130, 153 S. E. (2d) 184 (1967).

Under the factual situation in the *Colonial* case, this court did hold that interest and penalties should not be imposed. Admittedly, the facts of that case and the statutory law involved are distinguishable from those in the instant case. The *Colonial* case, nevertheless, recognized and applied the proposition that an insurer may under some unusual circumstances be relieved of interest and penalties, at least where the imposition of such would be clearly inequitable, without resort to estoppel or violence to the general rule that liability for penalty or interest cannot be avoided on the ground of the good faith belief or contention of the taxpayer that he is not liable for the tax.

In the *Springfield* case and other decisions of this court, when appropriate, we have followed and applied the rule that,

"(I)f a demurrer to a pleading raises merely a doubtful question or the case is such that justice may be promoted by trial on the merits, the court should exercise a fair, judicial discretion to that end, although it may be that in 'technical points the grounds of demurrer are sustainable under strict law."

We intimate no opinion as to the merit, or lack thereof, in respondent's asserted defense to interest and penalties, but under the principles enunciated in the *Springfield* case, we are unwilling to hold that the court below was in error in overruling the demurrer. On the other

hand, we hold only that the respondent should be allowed to prove, if it can, that it has a meritorious defense against interest and penalties.

The order of the lower court is, accordingly, affirmed in this respect, but is reversed as to all other issues and the cause remanded for further proceedings in accordance with the views herein expressed.

Reversed in part; affirmed in part; and remanded.

Moss, C. J., and LEWIS, BRAILSFORD and LITTLEJOHN, JJ., concur.